# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WHEELABRATOR LISBON INC., et al.,
    Plaintiffs,

    v.

STATE OF CONNECTICUT
DEPARTMENT OF PUBLIC UTILITY
CONTROL, et al.,
    Defendants.

Civil Action No.
3:04cv1436 (SRU)

## MEMORANDUM OF DECISION

Wheelabrator Lisbon Inc. ("Wheelabrator")[1] and Minnesota Methane LLC ("Minnesota

Methane") (collectively, "the generators") have sued the Connecticut Department of Public

Utility Control and its individual commissioners (collectively, "the DPUC") pursuant to 42

U.S.C. § 1983.  Connecticut Light & Power ("CL&P") intervened as a defendant.

In essence, Wheelabrator and Minnesota Methane seek declaratory and injunctive relief

from two DPUC rulings, arguing that the rulings modified their contracts with CL&P in direct

conflict with the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. § 824a-3

and related Federal Energy Regulatory Commission ("FERC") regulations, and in violation of the

Contracts Clause and Takings Clause of the United States Constitution.  The rulings require

Wheelabrator and Minnesota Methane to transfer renewable energy certificates ("RECs"), also

known as Generation Information System Certificates ("GIS Certificates"), to CL&P based on

the generators' energy (or power) purchase agreements ("EPAs") with the public utility.

The DPUC and CL&P moved to dismiss the complaint on various grounds.  During oral

---

[1] Wheelabrator Lisbon Inc. was formerly known as Riley Energy Systems of Lisbon
Corporation.

argument on those motions, it was apparent that the fact-based disputes were limited.  I indicated my preference to convert the defendants' motions to dismiss into motions for summary judgment and requested that the parties brief the remaining fact-based issues.  Subsequently, Wheelabrator and Minnesota Methane filed a motion for summary judgment, and the DPUC and CL&P filed supplemental briefs in support of summary judgment in their favor.  The present decision treats the parties' motions as cross-motions for summary judgment.

Because the DPUC's rulings do not modify the contracts, there is no violation of federal law or the Constitution.  Accordingly, I grant summary judgment in favor of the defendants.

## I.    Background

The parties do not dispute the facts underlying the present dispute.

### A.    Regulatory Framework

The contracts at issue are creatures of federal and state statutes, DPUC regulations, and DPUC decisions.  When the EPAs were executed, CL&P was an "electric company" under Conn. Gen. Stat. § 16-1(a)(8) and a "public service company" under Conn. Gen. Stat. § 16-1(a)(4). CL&P was subject to regulation by the DPUC under Title 16 of the Connecticut General Statutes.  Pursuant to Conn. Gen. Stat. § 16-243a, CL&P was required to enter into contracts to purchase the "electrical energy and capacity" of generating plants owned by private power producers ("PPPs") as defined in Conn. Gen. Stat. § 16-243b(a)(3).

Connecticut enacted section 16-243a, *et seq.* to implement Section 210 of PURPA, 16 U.S.C. § 824a-3.  PURPA required the FERC to prescribe rules encouraging cogeneration and small power production and requiring electric utilities to purchase electricity from certain defined "qualifying facilities" ("QFs") (a category of generators similar to PPPs).  *See* 16 U.S.C. §

824a-3(a)(2).  Under section 210(f) of PURPA, the DPUC was required to implement the rules

prescribed by PURPA.  *See* 16 U.S.C. § 824a-3(f)(1).

The DPUC implemented PURPA through several decisions and regulations, including

regulations for the procurement of electricity by electric companies from PPPs.  *See* Conn.

Agency Regs. § 16-243a-1, *et seq.*  Those regulations set forth a proposal and contracting process

to permit an electric utility to obtain additional electric generating capacity.  Conn. Agency Regs.

§ 16-243a-5.  Certain renewable projects were exempted from the standard process and were able

to obtain contracts of up to thirty years with the electric company.  Conn. Agency Regs. § 16-

243a-7.

In 1991, the DPUC issued a standard EPA for use by certain exempt PPPs.  Docket No.

89-01-16 – Standard Electricity Purchase Agreement for Exempt Private Power Producers.  (Ex.

12.[2])  Minnesota Methane's EPA was based on that standard form.  Wheelabrator's EPA was not.

B.    Energy Purchase Agreements

In the 1990s, both Wheelabrator and Minnesota Methane petitioned the DPUC, seeking

approval of their respective EPAs to require CL&P to purchase electricity from them under the

terms set forth in those agreements.  Both generators represented that they were sellers of

renewable energy and eligible for regulatory treatment as such.

In response to the petitions, the DPUC issued two decisions, approving the EPAs and

ordering CL&P to enter into those contracts.  *See* DPUC Decision, Petition of Minnesota

Methane, Docket No. 96-07-21 (Oct. 30, 1996) (Ex. 3) ("1996 Minnesota Methane Decision");

_____

[2] Citations to exhibits refer to the exhibits included in Attachment 1 of CL&P's
Memorandum of Law in Support of its Motion to Dismiss.

DPUC Decision, Petition of the Riley Energy Corporation, Docket No. 91-01-12 (Mar. 13, 1991) (Ex. 4) ("1991 Wheelabrator Decision").

Pursuant to the EPA with Wheelabrator, CL&P agreed to purchase the "entire net electric output," from Wheelabrator's trash-to-energy project in Lisbon, Connecticut. Pursuant to the EPA with Minnesota Methane, CL&P agreed to purchase the "entire electric output net of station use" from Minnesota Methane's landfill gas project in Hartford.

At the time that Wheelabrator's and Minnesota Methane's EPAs were approved and executed, no intangible property in the form of GIS Certificates existed in Connecticut as a separate tradable commodity. Thus, the contracts do not mention the transfer of GIS Certificates or RECs.

C.       GIS Certificates and Renewable Energy Portfolio Standards

GIS Certificates are tradable certificates created to promote increased use of energy from renewable energy sources. Pursuant to the Generation Information Operating Rules, the New England Power Pool ("NEPOOL") creates GIS Certificates that are distributed to generators, such as Minnesota Methane and Wheelabrator, based on the electric output of their facilities. One GIS Certificate is created for each megawatt-hour produced by a generator located in New England or whose electric output is imported into New England, including the megawatt-hours produced by Wheelabrator's Lisbon facility and Minnesota Methane's Hartford facility. *See* GIS Rule 2.1(a) (Ex. 13).

The electricity sold by generators, such as Minnesota Methane and Wheelabrator, can be unbundled, and the energy sold separately from its renewable attribute. In other words, the GIS Certificates are commodities that can be traded separately from the energy produced.

-4-

In Connecticut, electric supplies are required to include in their resource portfolios certain minimum amounts of electricity purchased from renewable sources.  Conn. Gen. Stat. § 16-254a. Electric companies can satisfy that obligation in various ways, including through purchases of GIS Certificates.

  D.  <u>Ownership of the GIS Certificates</u>

The parties' current dispute stems from the question whether the two EPAs require the generators to transfer to CL&P the GIS Certificates that are associated with the generators' electrical output.

CL&P submitted that issue to the DPUC for resolution, filing petitions for declaratory rulings.  Docket No. 96-07-21, Petition of CL&P to Reopen Docket No. 96-07-21 and for a Declaratory Ruling to Resolve Dispute concerning Ownership of Generation Information Certificates (Ex. 4); Docket No. 91-01-12, Petition of CL&P to Reopen Docket No. 91-01-12 and for the Resolution of Dispute Concerning Ownership of Generation Information System Certificates (Sept. 8, 2004) (Ex. 8).

  E.  <u>DPUC Decisions</u>

In response to CL&P's petitions, the DPUC reopened the 1996 Minnesota Methane Decision and the 1991 Wheelabrator Decision and issued two rulings.  *See* DPUC Decision, Docket No. 96-07-21RE01 (Mar. 19, 2004) (Ex. 5) ("2004 Minnesota Methane Decision"); DPUC Decision, Docket No. 91-01-12RE01 (Dec. 6, 2004) (Ex. 9) ("2004 Wheelabrator Decision").

 In the 2004 Minnesota Methane Decision, the DPUC made three findings of fact:

  1. [Minnesota Methane] presented itself to the [DPUC] as a seller of

renewable energy and as such eligible for the regulatory treatment it
requested.

2.  The GIS Certificates, that merely quantify the renewable attributes of the
"electricity," are and were intended by the [DPUC] to be sold by [Minnesota
Methane] and purchased by CL&P.

3.  The renewable attributes of the electricity sold by [Minnesota Methane] to
CL&P included the renewable attributes of the [Minnesota Methane] facility
because they were the necessary condition for the [DPUC] to approve
CL&P's entering into the [EPA] with [Minnesota Methane].

2004 Minnesota Methane Decision at 14-15.  The DPUC granted CL&P's requested declaratory

ruling, ordering Minnesota Methane to transfer to CL&P "[a]ll existing and future GIS

Certificates issued for the [Hartford] facility" and "[p]roceeds from any prior sale of the

Certificates."  2004 Minnesota Methane Decision at 15.

Likewise, in the 2004 Wheelabrator Decision, the DPUC concluded that Wheelabrator

and CL&P "intended that renewable energy attributes generated by [Wheelabrator], which are

now nominally known and monetized as GIS Certificates, be included in the 'entire net electric

output of the facility.'" 2004 Wheelabrator Decision at 11.  The DPUC noted that when it

approved the EPA between Wheelabrator and CL&P, "the 'electricity' that [Wheelabrator]

offered to sell and that the [DPUC] ordered CL&P to purchase necessarily meant electricity

generated by renewable fuel."  *Id*.  The DPUC concluded that CL&P is entitled to all existing and

future GIS Certificates issued for the Lisbon facility and to proceeds from any prior sale of GIS

Certificates by Wheelabrator.  *Id.* at 12.

F.    State Court Appeal

Both Wheelabrator and Minnesota Methane appealed their respective DPUC decision to

the Connecticut Superior Court, pursuant to Conn. Gen. Stat. § 4-183 of the Uniform

Administrative Procedure Act.  On March 20, 2006, the Superior Court rendered decisions in those appeals.  *Minnesota Methane LLC v. Connecticut Dep't of Public Utility Control*, CV04-0527217-S (Conn. Super. Ct. Mar. 20, 2006); *Wheelabrator Lisbon, Inc. v. Connecticut Dep't of Public Utility Control*, CV05-4003405 (Conn. Super. Ct. Mar. 20, 2006).  In both cases, the Superior Court affirmed the underlying DPUC decision.  The Court noted that the appeals raised issues under both state and federal law, but addressed only the state law issues because "the parties have agreed to reserve the federal claims for federal court determination."  *Minnesota Methane* at 2; *Wheelabrator Lisbon* at 3.

**II.   Discussion**

As a result of the Superior Court decisions and the parties' agreement that the federal claims would be adjudicated in federal court, many of the arguments raised by the DPUC and CL&P in their motions to dismiss are now moot.  Thus, it is unnecessary for me to consider the defendants' arguments regarding: prudential ripeness, the contracts' choice-of-forum clauses, *Younger* abstention, *Burford* abstention, and failure to exhaust state administrative remedies.[3]

The defendants' remaining arguments concern: federal subject matter jurisdiction, failure to exhaust federal administrative remedies, the Johnson Act, and – reaching the merits of the plaintiffs' claims – whether the DPUC rulings modified or interpreted the two EPAs.

A.   Subject Matter Jurisdiction – Federal Question

The DPUC challenged the court's subject matter jurisdiction by arguing that Wheelabrator and Minnesota Methane raised their federal preemption claim "merely as a defense

_____

[3]  I also note that, at oral argument, the DPUC conceded that the plaintiffs have standing to bring the instant case.

to the enforcement of the DPUC's future determination on the ownership of the GIS Certificates associated with the [contracts]."  DPUC Memo. Supp. Motion to Dismiss (doc. # 50-5) at 21. The DPUC maintained that footnote 14 of the Supreme Court's decision in *Shaw v. Delta Air Lines, Inc.*, should not extend to the present case.  In *Shaw*, the Supreme Court noted that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."  463 U.S. 85, 96 n.14 (1983).

The DPUC relied largely on *Fleet Bank v. Burke*, 160 F.3d 883 (2d Cir. 1998), to argue the inapplicability of *Shaw*'s footnote 14.  In *Fleet Bank*, the Second Circuit decided against extending the *Shaw* footnote "beyond instances where the plaintiff, seeking an injunction on the ground of preemption, does not dispute the meaning and application of state law."  160 F.3d at 893.

Because the Superior Court has issued its rulings on the generators' state law claims, I am barred from considering those claims by principles of collateral estoppel.  Accordingly, the DPUC's concerns regarding unwarranted federal interference with state courts or a potential grant of injunctive relief on the basis of state law, *see Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984), are moot.

The claims remaining before me do raise federal questions, namely, whether PURPA preempts the DPUC decisions at issue in this case and whether the DPUC decisions violate the United States Constitution.  Accordingly, subject to the applicability of the Johnson Act, discussed below, I have subject matter jurisdiction over the present action.

B.      Johnson Act

CL&P has argued that the Johnson Act precludes my exercise of subject matter

jurisdiction over the parties' dispute.

The Johnson Act, 18 U.S.C. § 1342, prevents federal courts from enjoining utility rates

that are set by state rate-making agencies.[4]  The statute provides:

> The District Courts shall not enjoin, suspend or restrain the operation of, or
> compliance with, any order affecting rates chargeable by a public utility and
> made by a State administrative agency . . . where:
>
>> (1) Jurisdiction is based solely on diversity of citizenship or
>> repugnance of the order to the Federal Constitution; and,
>>
>> (2) The order does not interfere with interstate commerce; and,
>>
>> (3) The order has been made after reasonable notice and hearing; and,
>>
>> (4) A plain, speedy and efficient remedy may be had in the courts of
>> such State.

18 U.S.C. § 1342.

1.      *Are DPUC decisions "order[s] affecting rates chargeable by a public
        utility"?*

The threshold inquiry for application of the Johnson Act is whether the DPUC decisions

are "order[s] affecting rates chargeable by a public utility and made by a State administrative

agency."  18 U.S.C. § 1342(1).

The DPUC is a State administrative agency.  *See* Conn. Gen. Stat. §§ 16-1b, 16-2;

*Greenwich v. Dep't of Public Utility Control*, 219 Conn. 121 (1991).  CL&P is a public utility.

---

    [4] The Johnson Act explicitly applies to injunctive relief, but has been extended to bar
declaratory judgment actions as well.  *See Carlin Communication v. Southern Bell Telephone
and Telegraph Co.*, 802 F.2d 1352, 1355 (11th Cir. 1986) (citing *Tennyson v. Gas Service Co.*,
506 F.2d 1135, 1139 (10th Cir. 1974)).

*See* 16 U.S.C. § 824(e); Conn. Gen. Stat. § 16-1(a)(4); *Connecticut Light & Power Co. v. Dep't of Public Utility Control*, 210 Conn. 349, 354 (1989).

CL&P argues that the DPUC decisions are "order[s] affecting rates chargeable by a public utility," relying principally on *Bridgeport Hydraulic Co. v. Council on Water Company Lands*, 453 F. Supp. 942 (D. Conn. 1978) (three-judge panel). In *Bridgeport Hydraulic*, the court was asked to consider the constitutionality of certain state statutes and regulations affecting public utility companies. With respect to one of the claims, the court considered whether the Johnson Act precluded federal court review. The claim related to the 1972 Amendments to the Uniform System of Accounts, which altered the accounting treatment accorded to gains and losses on the sale of land owned by water companies. *Id.* at 952. The court noted that the new requirement regarding "above the line" entry of gains or losses on the sale of land "affecte[d] the computation of the company's operating income which, in turn, influence[d] the ratemaking process." *Id.* The question presented was "whether a gain on the sale of a company's nondepreciable asset should inure to shareholders as capital surplus, or to ratepayers as a reduction in the cost of service." *Id.* at 953.

The court held that the Johnson Act's proscription of federal judicial review applied to that issue even though the 1972 Amendments were regulations of a general nature. *Id.* at 954. The court noted that the purposes of the Johnson Act – namely, to prevent forum-shopping by utilities and to keep constitutional challenges to orders affecting rates out of federal courts – were particularly served because two state courts were then considering the validity of the 1972 Amendments. Other courts have likewise interpreted the Johnson Act broadly. *See, e.g.*, *U.S. West v. Tristani*, 182 F.3d 1202, 1210 (10th Cir. 1999) (state utility commission's administrative

imputation power was "an integral part of the rate structure" and covered by the Johnson Act).

CL&P argues that the DPUC decisions at issue in the present case more directly affect rates than the amendments at issue in *Bridgeport Hydraulic* because any revenue that CL&P receives from the sale of the GIS Certificates will be credited to its customers, directly lowering their electric rates.  CL&P Memo. Supp. Motion to Dismiss (doc. # 48-1) at 24.

In its petitions to the DPUC, CL&P asserted that any value associated with GIS Certificates that CL&P receives would be credited to its customers through the Competitive Transition Assessment component of the customers' bills.  *See* CL&P Minnesota Methane Petition (Ex. 4 to Attachment 1 of CL&P Memo. Supp. of Motion to Dismiss) at 9-10; CL&P Wheelabrator Petition (Ex. 8 to Attachment 1 of CL&P Memo in Supp. of Motion to Dismiss) at 10.  CL&P claims that those credits directly lower electricity rates.  CL&P Memo. Supp. Motion to Dismiss at 24.

Although the Competitive Transition Assessment component of a customer's bill is not strictly the "rate" charged by CL&P, the Johnson Act's bar extends to such indirect effects on rates.  *See, e.g.*, *Hill v. Kansas Gas Service Co.*, 323 F.3d 858, 864 (10th Cir. 2003) (Johnson Act's bar applied to orders requiring refunds to qualified low-income natural gas customers, even though the orders did not *directly* involve a "rate").

2.    *Four Preconditions for Applicability of the Johnson Act*

In addition to satisfying the threshold inquiry, CL&P and the DPUC bear the burden of showing that the four preconditions of the Johnson Act are met.  *See, e.g.*, *Williams v. Professional Transportation, Inc.*, 388 F.3d 127, 131 (4th Cir. 2004).

-11-

a.      Jurisdiction Based on Diversity of Citizenship or Repugnance to the Federal Constitution

The generators do not assert jurisdiction based on diversity of citizenship, but two of their claims are based on alleged violations of the United States Constitution.  With respect to those claims, the first precondition has been met.

With respect to the generators' preemption claim, the defendants concede that the Johnson Act does not affect this court's exercise of jurisdiction.  *See* CL&P Memo. Supp. Motion to Dismiss at 24 n.25.  Indeed, the Second Circuit has held that, when a plaintiff seeks judicial review of an order affecting rates based on both constitutional and preemption grounds, only those claims or aspects of claims based on repugnance to the Constitution should be dismissed pursuant to the Johnson Act.  *See Evans v. New York State Public Service Commission*, 287 F.3d 43, 46-47 (2d Cir. 2002) (affirming district court's dismissal of constitutional – but not statutory – challenges to order to the extent that it involved rates chargeable).

b.      Interference with Interstate Commerce

The generators do not contend that the DPUC decisions interfere with interstate commerce.

c.      Reasonable Notice and Hearing

The generators do not contest that there was reasonable notice and a hearing before the DPUC decisions were issued.

d.      Remedy in State Court

Although the first three conditions have been satisfied with respect to the generators'

-12-

constitutional claims, the fourth precondition, "[a] plain, speedy and efficient remedy may be had in the courts of such State," requires particular consideration.

Earlier in the instant proceeding, it appeared that a plain, speedy and efficient remedy was available to the plaintiffs in Connecticut Superior Court, and the generators had filed the appropriate appeals to that court.  In those proceedings, however, the parties agreed that the state court would not consider the federal statutory and constitutional issues before it, and the court did not consider those claims.  Thus, unlike in *Bridgeport Hydraulic*, there is not a state court considering the constitutionality of the DPUC rulings.  Here, the parties appear to have stipulated to federal court review, thereby undermining one of the purposes of the Johnson Act's proscription, effecting a "general hands-off policy [in federal court] relative to state rate making." *Bridgeport Hydraulic*, 453 F. Supp. at 954.

Because of the procedural posture of the instant case and the parties' agreements in Superior Court, the fourth precondition of the Johnson Act is not satisfied.  Thus, the Johnson Act does not bar federal court jurisdiction under the circumstances of this case.

C.    Exhaustion of Federal Administrative Remedy

The defendants contend that the generators' failure to seek review of the DPUC decisions before the FERC bars their challenge in federal district court.

By enacting PURPA, Congress sought "to promote long-term economic growth by reducing the nation's reliance on oil and gas, to encourage the development of alternative energy sources and thereby to combat a nationwide energy crisis."  *Niagra Mohawk Power Corp. v. FERC*, 306 F.3d 1264, 1266 (2d Cir. 2002) (internal quotation marks and citation omitted). "Section 210 of PURPA's Title II, 16 U.S.C. § 824a-3, encourages the development of

cogeneration and small power production facilities, which Congress believed would reduce the demand for traditional fossil fuels." *Id.* at 1266.

Pursuant to section 210(a), the FERC must promulgate rules that encourage such power production. Section 210(b) sets forth the standards that the FERC must follow in prescribing rules for sales by QFs to electric utilities. Pursuant to section 210(f), state regulatory agencies, such as the DPUC, are obligated to implement the FERC rules through their own rule-making, including rules pertaining to electric utilities' obligation to purchase power from QFs, such as Wheelabrator and Minnesota Methane.

Under PURPA section 210(h)(2)(B), public utilities and QFs, such as Minnesota Methane or Wheelabrator, are permitted to maintain a private action against a state regulatory authority, such as the DPUC, for failing to implement PURPA as required under section 210(f), provided the plaintiff first satisfies certain administrative prerequisites. *Id.* at 1269 (citing 16 U.S.C. § 824a-3(h)(2)(B)). Those prerequisites require the plaintiff to petition the FERC to initiate an enforcement action against the state regulatory authority before filing suit in district court. *Id.* at 1270.

In *Niagara*, a public utility filed suit in federal district court without first petitioning the FERC to initiate an enforcement action. The utility challenged the New York State Public Service Commission's ("PSC") enforcement of a New York law that required electric utilities to purchase electricity from QFs at specified minimum prices. *Id.* The Second Circuit upheld the lower court's dismissal because of the utility's failure to exhaust its administrative remedy: "Before Niagra may sue the PSC for a violation of PURPA, Niagra must first petition the FERC to enforce PURPA against the PSC." *Id.* at 1269. The court held that the exhaustion

requirement applied with equal force to the plaintiff's claim under the Supremacy Clause. *Id.* at 1270.

The generators rely principally on *Freehold Cogeneration Associates v. Board of Regulatory Commissioner of New Jersey*, 44 F.3d 1178 (3d Cir. 1995), to argue that their failure to petition the FERC does not bar me from considering their claims. The plaintiff in *Freehold* was, like Minnesota Methane and Wheelabrator, a QF that had a long-term contract with a state public utility for the purchase of energy. After the Board of Regulatory Commissioners of the State of New Jersey ("BRC") ordered the QF to renegotiate the purchase rate term of its contract with the utility, the QF filed suit in federal district court, seeking a declaratory judgment and injunction to enjoin the BRC from enforcing that order. *Id.* at 1183. The parties disagreed regarding whether the QF was challenging the BRC's implementation of the FERC's rules under section 210(a) or whether it was challenging the BRC's actions under section 210(e). *Id.* at 1184.

The Third Circuit considered the claim a challenge to the BRC's proceeding based on preemption under section 210(e) of PURPA and the FERC regulations promulgated thereunder, which exempt QFs from state utility regulation. *Id.* at 1185 (citing 16 U.S.C. § 824a-3(e)(1); 18 C.F.R. § 292.602(c)). Because the court concluded that the QF was "essentially claiming that the BRC [was] subjecting it to regulations precluded by 210(e)," the court held that the claim was not barred by the jurisdictional limitations of section 210(g)(1). *Id.* at 1185.

Wheelabrator and Minnesota Methane have argued that their complaint is not barred by section 210(g)(1) because the DPUC decisions are akin to the order in *Freehold*, and impose utility-type regulations preempted by section 210(e) and related FERC regulations. In addition to allegations concerning section 210(e), the generators allege that the DPUC decisions violate

-15-

section 210(b)(2) and 18 C.F.R. § 292.304(a)(ii) because they discriminate between cogeneration QFs and small power production QFs.  Compl. ¶ 50.

Wheelabrator and Minnesota Methane have not filed a petition before the FERC to initiate an enforcement against the DPUC.  Because the generators have not exhausted their federal remedies, I am barred from considering their claims to the extent they are based on the DPUC's failure to implement PURPA pursuant to section 210(f).  16 U.S.C. § 824a-3(g)(2); *Niagra*, 306 F.3d at 1296.

        D.    <u>Preemption</u>

The generators argue that the DPUC decisions impose utility-type regulation in direct conflict with section 210(e), 18 C.F.R. § 292.602(a), and the FERC's determinations in *American Ref-Fuel Company*, 105 FERC ¶ 61,004 (2003), *reh'g denied*, 107 FERC ¶ 61,016 (2004), *appeal dismissed sub nom.*, *Xcel Energy Serv. Inc. v. FERC*, 407 F.3d 1242 (D.C. Cir. 2005) ("*American Ref-Fuel*").

In *American Ref-Fuel*, several QFs had petitioned the FERC for an order declaring that avoided-cost contracts entered into pursuant to PURPA, absent express provisions to the contrary, do not inherently convey to the purchasing utility any RECs.  *Id.* at 61,005.  In response, the FERC addressed the relationship between PURPA contracts for the sale of QF capacity and energy and the ownership of RECs.

The FERC specifically declared:

> 23.  . . .  RECs are relatively recent creations of the States. Seven States have adopted Renewable Portfolio Standards that use unbundled RECs.  What is relevant here is that the RECs are created by the States.  They exist outside the confines of PURPA. PURPA thus does not address the ownership of RECs. And the contracts for sales of QF capacity and energy, entered into

-16-

pursuant to PURPA, likewise do not control the ownership of the RECs (absent an express provision in the contract).  States, in creating RECs, have the power to determine who owns the REC in the initial instance, and how they may be sold or traded; it is not an issue controlled by PURPA.

24.  We thus grant Petitioners' petition for a declaratory order, to the extent that they ask the Commission to declare that contracts for the sale of QF capacity and energy entered into pursuant to PURPA do not convey RECs to the purchasing utility (absent an express provision in a contract to the contrary). While a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created RECs, that requirement must find its authority in state law, not PURPA.

*American Ref-Fuel*, 105 FERC at 61,007.

The FERC concluded that RECs are created by the State and controlled by state law, not PURPA, and that they may be decoupled from the renewable energy.  The parenthetical reference to the effect of an express contractual provision might suggest that the FERC considered an express contractual provision to be the only means for RECs, associated with energy sold pursuant to a PURPA contract, to be transferred to a utility.[5]  Taken as a whole, however, *American Ref-Fuel* does not stand for the proposition that PURPA requires an express contractual provision in order for RECs or GIS Certificates to be transferred to a public utility pursuant to a PURPA contract.  "While a state may decide that a sale of power at wholesale automatically transfers ownership of the state-created RECs, that requirement must find its authority in state law, not PURPA."  *Id.*

---

[5] In its order denying rehearing, the FERC noted that the reference to an "express contractual provision" seems to have been misunderstood.  *American Ref-Fuel*, 107 FERC ¶ 61,016, at 61,042 n.1 (2004).  The FERC elaborated: "We did not mean to suggest that the parties to a PURPA contract, by contract, could undo the requirements of State law in this regard. All we intended by this language was to indicate that a PURPA contract did not inherently convey any RECs, and correspondingly that, assuming State law did not provide to the contrary, the QF by contract could separately convey the RECs."  *Id.* (emphasis added).

With respect to the generators' preemption claim based on section 210(e) and

implementing regulations, the DPUC decisions are unlike the BRC order that was the subject of

*Freehold*.  Contrary to the BRC, the DPUC has not ordered the generators to renegotiate the

contract purchase price or ordered lower rates.  Rather, the DPUC considered the two EPAs at

issue and concluded that those contracts transferred the renewable energy and the associated GIS

Certificates to CL&P.

In discussing intent with respect to the GIS Certificates, the DPUC's choice of language

may be imprecise because the EPAs pre-date the creation of GIS Certificates.  MM Decision at

15 ("The GIS Certificates, that merely quantify the renewable attributes of the 'electricity,' are

and were intended by the [DPUC] to be sold by MM and purchased by CL&P.").  Nevertheless,

neither PURPA, the regulations, nor *American Ref-Fuel* preempt the DPUC's decisions that the

GIS Certificates associated with the renewable energy transferred pursuant to the two EPAs must

also be transferred to CL&P.  As the FERC noted in *American Ref-Fuel*, RECs "exist outside the

confines of PURPA.  PURPA thus does not address the ownership of RECs."  *Id.* at 61007.

E.    Constitutional Claims

The generators claim that the DPUC's decisions, ordering them to transfer the GIS

Certificates to CL&P violate the Contract Clause and the Takings Clause.[6]

1.    *Contract Clause*

"States violate the Contract Clause when legislative action interferes with existing

contractual relations. . . . [T]he prohibition is aimed at the legislative power of the State, and not

_____

[6] Neither party briefed the merits of the generators' constitutional claims, and until the issuance of the Superior Court decisions, the Johnson Act may have barred my consideration of those claims.

at . . . acts of administrative or executive boards or officers. . . ." *Kinney v. Connecticut Judicial Dep't*, 974 F.2d 313, 314 (2d Cir. 1992) (internal citations and quotations omitted).

The generators have alleged that the DPUC decisions and Section 7 of Connecticut Public Act No. 03-135, approved June 26, 2003, as applied therein, violate the Contract Clause by retroactively altering their contracts with CL&P.  With respect to the effect of the challenged legislation, I reject the generators' argument that the State has retroactively altered their contracts.  When the EPAs were negotiated and executed, GIS Certificates were not in existence. The DPUC took into consideration the renewable attribute when approving the EPAs, including those terms that were favorable to the generators due to the renewable attribute of the energy they produced.  The DPUC later determined that the renewable attribute of the transferred energy, now monetized in the form of GIS Certificates, must be transferred to CL&P.  That determination, an interpretation of the parties' EPAs, does not impair the original contracts.

  2. *Taking Clause*

The Takings Clause provides that "[p]rivate property shall not be taken for a public use, without just compensation."  The generators allege that they own the GIS Certificates, which are "a form of valuable and marketable intangible private property."  Compl.  ¶ 59.

As noted above, the GIS Certificates were created after the parties entered into the EPAs. NEPOOL's assignments of the GIS Certificates were made "without prejudice to which person or entity is the owner of such certificates."  The RECs or GIS Certificates are creations of state legislation and regulation, and the DPUC has determined that CL&P is the owner of the GIS Certificates associated with the renewable energy it purchases from Wheelabrator and Minnesota Methane pursuant to the parties' EPAs.  Accordingly, the generators have not been deprived of a

-19-

property interest because NEPOOL's initial assignment to them did not confer ownership of RECs or GIS Certificates.

**III.    Conclusion**

The defendants' motions to dismiss **(docs. # 47 & 50)**, which I have treated as motions for summary judgment, are GRANTED.  The plaintiffs' motion for summary judgment **(doc. # 66)** is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 23rd day of June 2006.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge